UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

LIBERTY BELL BANK,

               Plaintiff,               Civil No. 13-7148 (NLH/KMW)

v.

                             **OPINION**

LUIS G. ROGERS, et al.,

               Defendants.

_____

**APPEARANCES:**

Richard D. Gallucci, Jr., Esq.
Spector Gadon & Rosen, P.C.
1635 Market Street
7th Floor
Philadelphia, Pennsylvania 19103

     *Counsel for Plaintiff*

Luis G. Rogers
123 Colonial Road
Beverly, New Jersey 08010

     *Defendant Pro Se*

Douglas F. Johnson, Esq.
Earp Cohn P.C.
20 Brace Road
4th Floor
Cherry Hill, New Jersey 08034

     *Counsel for Martin Mellman, Receiver for Defendants*
     *Lease Group Resources, Inc., LGR Consortium, Inc., LGR*
     *Group, Inc., and University Copy Services*

Corinne Samler Brennan, Esq.
Klehr Harrison Harvey Branzburg LLP
457 Haddonfield Road
Cherry Hill, New Jersey 08002

     *Counsel for Intervenor Susquehanna Bank*

1

David A. Van Grouw, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, New Jersey 07068

    *Counsel for Intervenor Kyocera Document Solutions America, Inc.*

**HILLMAN, District Judge:**

    Presently before the Court is a motion [Doc. No. 165] filed by Plaintiff, Liberty Bell Bank, for summary judgment pursuant to Fed. R. Civ. P. 56.  The Court has considered Plaintiff's submission, no opposition thereto having been filed, and decides this matter pursuant to Fed. R. Civ. P. 78.  For the reasons that follow, Plaintiff's motion is granted in part and denied in part.

**I.**    **BACKGROUND**

    This action involves a fraudulent scheme orchestrated by Defendant Luis G. Rogers through various entities that Rogers controlled, which has caused multi-million dollar losses to Plaintiff.  In an amended complaint filed on February 18, 2014, Plaintiff alleges that Defendants violated the federal Racketeer Influenced and Corrupt Organizations Act (hereafter, "RICO") as well as the New Jersey RICO statute, committed common law fraud and conversion, and engaged in fraudulent transfers of assets. Plaintiff also asserts a breach of contract claim against Defendant Lease Group Resources, Inc. (hereafter, "LGR"), as well as a breach of guaranty claim against Defendant Rogers.

Upon Plaintiff's motion, on March 5, 2014 the Court appointed a Receiver on behalf of one of Rogers' entities, Defendant LGR.  Subsequently, the Court entered a revised Order appointing the Receiver on behalf of LGR, as well as on behalf of Defendants LGR Group, Inc. (hereafter, "LGR Group"), LGR Consortium, Inc. (hereafter, "LGR Consortium"), and University Copy Services (hereafter, collectively the "LGR Entities").  The LGR Entities are controlled and beneficially owned by Rogers. (Pl.'s Statement of Undisputed Material Facts (hereafter, "Pl.'s SOF") ¶ 95.)

Plaintiff now moves for summary judgment on the claims in the amended complaint.  In response, the Receiver advised the Court that he "lacks a sufficient factual basis to oppose Liberty Bell Bank's Motion for Summary Judgment."  (Response of Martin Mellman, Receiver for Lease Group Resources, Inc. to Mot. for Summ. J. of Liberty Bell Bank [Doc. No. 175].)  Defendant Rogers, who is proceeding pro se, requested a substantial extension of time to respond to the motion, and although the Court denied Rogers' request, it did grant Rogers a short extension.  (Order [Doc. No. 185], Mar. 18, 2015.)  Rogers thereafter filed responses to other motions that were pending at

the time, but he has never filed opposition to the motion for summary judgment.[1]

Beginning in 2005, Plaintiff extended over one hundred secured loans to LGR.  (Pl.'s SOF ¶ 1.)  LGR collected lease payments from lessees and was supposed to use those lease payments to repay Plaintiff for the loans.  (Id. ¶ 3.)  Each loan was supported by a loan package completed by Defendant Rogers, which documentation included a promissory note, a business loan agreement, a commercial security agreement, a UCC-1 financing statement identifying the equipment, an assignment from LGR to Plaintiff of all monies due and to become due under the leases, with a direction to the equipment lessee to pay Plaintiff directly, the original lease being assigned to

---

[1] Local Civil Rule 56.1 requires a party moving for summary judgment to provide a statement of material facts not in dispute, in separately numbered paragraphs which cite to documents submitted in support of the motion.  L. Civ. R. 56.1(a).  The party opposing summary judgment must then provide a responsive statement of material facts, "addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion[.]"  Id.  Pursuant to the rule, "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  Id. In this case, Plaintiff provided a statement of undisputed material facts, in compliance with Local Civil Rule 56.1. Because no party has opposed the motion, these material facts are deemed undisputed for purposes of the summary judgment motion and are set forth below.  See id.

Plaintiff, and a supporting cost sheet showing equipment prices equal to the amount of the loan.  (Id. ¶ 4 n.2.)

Typically, a government agency initially entered into a lease with an equipment manufacturer, and the equipment manufacturer then assigned the lease to LGR.  (Id. ¶ 7.)  LGR, in turn, assigned the lease to Plaintiff.  (Id.)  The assignment of lease payments and the security interests in the equipment -- which were primarily copy machines -- served as collateral for each loan.  (Id. ¶ 6.)  If the end user had entered into a lease directly with LGR, then LGR would assign that lease to Plaintiff.  (Id. ¶ 8.)

Rogers understood that Plaintiff was loaning money on the basis of the leases that were being assigned, and that Plaintiff would not have made such loans if the leases were not so assigned.  (Pl.'s SOF ¶ 9.)  However, many of the leases that were purportedly assigned to Plaintiff as collateral for the loans extended by Plaintiff did not exist.  (Id. ¶ 10.)  Rogers admitted that there were times when he took loan proceeds to fund equipment that was supposed to be subject to collateral leases, even though the leases were either canceled or taken back.  (Id. ¶ 11.)  Instead of using the loan proceeds from Plaintiff to purchase the equipment that was then to be leased to an end user, Rogers took the money and never had a valid assignment of the leases.

5

For example, Rogers and LGR represented to Plaintiff that Loan #8169 was to finance LGR's purchase of 143 Savin Models 9033 and ten Savin Models 9060 from Fax Plus, at a cost of $588,113.40 and $82,806.75, respectively.  (Cert. of Benjamin Watts [Doc. No. 165-5] (hereafter, "Watts Cert.") ¶ 3.)  Rogers further represented that the equipment would then be leased to the Defense Intelligence Agency (hereafter, "DIA"), under Lease 5508.  (Id.)  LGR provided the lease and the equipment to Plaintiff as security for the repayment of the loan.  (Id.)  Plaintiff fully funded the loan and paid over $670,000 to LGR in or about July 2010.  (Id.)  Rogers, however, never paid Fax Plus $588,113.40 for the 143 Savin Models 9033, and Lease 5508 was voided to the extent it included the lease of that equipment.  (Id. ¶ 4.)  Fax Plus then financed the purchase and took the lease payments as security for its purchase, and Plaintiff was left without any collateral to secure $588,113.40 of Loan #8169.  (Id.)  This information was never conveyed by Rogers to Plaintiff.  (Id.)

In addition to this conduct, Rogers also engaged in wrongdoing by obtaining loans from both Plaintiff and Susquehanna Bank for the purchase of equipment, and offering the equipment as collateral to both banks, thereby leaving the banks with competing claims to the same collateral.  (See Pl.'s SOF ¶ 19.)  For instance, Plaintiff and Susquehanna Bank each loaned

6

$1,224,165.29, for a total of $2,448,30.58, to purchase equipment from Kyocera. (Id. ¶ 21.)  Rogers then caused LGR to give the same equipment leases to both Plaintiff and Susquehanna Bank as collateral for the repayment of the loans. (Id.)  In so doing, Rogers obtained twice the value of the equipment he purchased from Kyocera, and the banks were left to compete over the interest in the collateral. (Id.)  Similarly, Defendants pledged to both Plaintiff and Susquehanna Bank certain equipment purchased from Fax Plus at a cost of $569,461.35, which equipment was included in Lease 5508 to the DIA. (Id. ¶ 22.)

Rogers never informed Plaintiff that any lease he had pledged had been canceled, terminated, or was otherwise unusable as collateral. (Pl.'s SOF ¶ 30.)  He testified that there were no controls in place at LGR to ensure that a lease that he thought would come to fruition actually did. (Id. ¶ 31.)  The loans from Plaintiff on which LGR has defaulted, which were secured by non-existent collateral, have a remaining balance of $1,272,296.00. (Id. ¶ 34.)  The loans on which LGR defaulted that were secured by doubly-pledged collateral have a remaining balance of $490,000. (Id. ¶ 35.)  Plaintiff has written off $373,630.02 of loans secured by Lease 5508. (Id. ¶ 36.)

In addition to the foregoing conduct, Defendants also engaged in a check-kiting scheme.  In particular, Rogers caused the LGR Entities to establish checking accounts with Plaintiff,

7

Susquehanna Bank and Roma Bank.  (Id. ¶ 37.)  LGR enjoyed next-
day availability at these three banks, such that if Rogers
deposited a check, the banks would credit the funds to Rogers
immediately as though he had deposited cash.  (Id. ¶ 39.)  When
LGR deposited a check into its accounts at Plaintiff's bank,
Plaintiff would make those funds available to LGR even though
the funds had not yet been paid by the bank upon whose accounts
the check was drawn.  (Id. ¶ 40.)  This allowed Defendants to
utilize funds not yet in their accounts, based on LGR's credit
strength and history of having the incoming checks ultimately
clear without problem.  (Id. ¶ 41.)  Defendants used this next-
day availability at all three banks to utilize funds and replace
funds with ultimately uncollectible checks in a circular
fashion.  (Id. ¶ 42.)

The check-kiting scheme fell apart on April 11, 2013, when
Roma's Executive Vice President, Keith Pericoloso, called Rogers
and told him that his accounts were blocked and that he should
not deposit any further checks.  (Id. ¶ 52.)  Later that
evening, Plaintiff received a notification that a large dollar
amount of checks were going to be returned from Roma Bank.  (Id.
¶ 54.)  On April 12, 2013, Plaintiff received checks back from
Roma Bank that were unpaid.  (Id. ¶ 55.)  During the days that
followed, Plaintiff applied a series of chargebacks to the
account, and there were ultimately more chargebacks than there

8

was money in the account.  (Id. ¶¶ 58-59.)  The account had been overdrawn in excess of $3 million.  (Id. ¶ 59.)  Additionally, by the end of April 2013, Defendants had overdrawn their account at Susquehanna Bank by $2,890,000, and at Roma Bank by $2,100,000, for a combined total in excess of $8 million.  (Id. ¶ 61.)  Although Rogers assured the banks that he would eventually pay them all of the money owed, Defendants still owed Plaintiff $2,089,911.04 in overdraft as of the date that Plaintiff filed this summary judgment motion.  (Id. ¶¶ 67, 70.)

## II.   JURISDICTION

Because Plaintiff asserts claims under the federal RICO statute, 18 U.S.C. §§ 1961-68, the Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The Court exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477

U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(citing Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir.

2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324, 106 S. Ct. 2548.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'"  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322, 106 S. Ct. 2548).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 257, 106 S. Ct. 2505.

IV.  **DISCUSSION**

**A. Breach of Contract (Count IV)**

Plaintiff asserts a breach of contract claim against LGR in connection with LGR's failure to make payments on the loans extended by Plaintiff.  "To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages."  Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL–CIO v. E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013) (citing Coyle v. Englander's, 199 N.J. Super. 212, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)).

In this case, the undisputed evidence demonstrates that Plaintiff extended over one hundred secured loans to LGR. (Pl.'s SOF ¶ 1.)  As collateral for each loan, LGR provided Plaintiff with a security interest in the equipment covered by the loans and all lease payments received in connection with the equipment.  (Am. Compl. ¶ 18; Answer ¶ 18.)  LGR collected the lease payments from the lessees and was supposed to use those payments to repay Plaintiff for the loans that the leases secured.  (Am. Compl. ¶ 19; Answer ¶ 19.)  At the time the amended complaint was filed in this case, there were sixty-four

12

loans outstanding.  (Watts Decl. ¶ 19.)  Starting in April 2013, LGR fell behind in paying its loans to Plaintiff.  (Pl.'s SOF ¶ 71.)  Ultimately, LGR defaulted on each of the sixty-four loans and has not repaid them.  (Pl.'s SOF ¶ 114; Watts Decl. ¶ 20.) At the time Plaintiff filed its summary judgment motion, the total remaining balance due on the loans was $2,222,299.64. (Pl.'s SOF ¶ 114.)  Plaintiff accelerated all amounts due under the loans and gave LGR and Rogers notice of the default and acceleration.  (Id. ¶¶ 115, 116.)

In response to the summary judgment motion, the Receiver, acting on behalf of LGR, indicated that it lacks a factual basis to oppose Plaintiff's motion.  LGR has thus failed to bring to the Court's attention any evidence that could conceivably create a genuine issue of material fact as to the validity or performance of the contracts at issue, and the Court therefore concludes that the contracts were valid and enforceable. Moreover, because it is undisputed that LGR was obligated to make payments of principal and interest under the loan documents and failed to do so, which has resulted in damages to Plaintiff in the amount of $2,222,299.64, the Court finds that Plaintiff is entitled to summary judgment on its claim against LGR for breach of contract.

**B. Breach of Guaranty (Count V)**

Plaintiff also seeks to enforce the personal guaranty executed by Defendant Rogers.  "To be entitled to judgment on a guaranty, a plaintiff must demonstrate:

1) execution of the guarantee by the guarantor (i.e., that it was the defendant who signed the guarantee);

2) the principal obligation and terms of the guaranty;

3) the lender's reliance on the guaranty in extending monies to the borrower;

4) default by the principal obligator;

5) written demand for payment on the guarantee;

6) failure of the guarantor to pay upon written demand."

Consol. Brick & Bldg. Supplies, Inc. v. Alosi Const., Inc., No. 05-1490, 2006 WL 2135805, at *6 (D.N.J. July 28, 2006) (quoting United States v. DelGuercio, 818 F. Supp. 725, 727-28 (D.N.J. 1993)).

Plaintiff is not entitled to summary judgment on its claim for breach of a personal guaranty against Rogers.  Rogers personally guaranteed all of the sixty-four loans to LGR at issue in this case.  (Pl.'s SOF ¶ 112.)  Under the terms of the guaranty, Rogers absolutely and unconditionally guaranteed full and punctual payment and satisfaction of the indebtedness of LGR up to a limit of $2 million.  (Id. ¶ 113.)  Plaintiff lent monies to LGR pursuant to the sixty-four loans at issue, and, as

14

discussed above, LGR has not remitted payment to Plaintiff in the amount of $2,222,299.64.  Plaintiff then wrote a letter to Rogers dated October 21, 2013 seeking payment on the debt.  (Am. Compl., Ex. I.)  Rogers has not paid despite Plaintiff's written demand for same.  (Pl.'s SOF ¶ 117.)

Notwithstanding the foregoing, Plaintiff fails to demonstrate one of the prima facie elements of a claim for breach of a personal guaranty.  Specifically, there is no evidence that Plaintiff relied on the guaranty in extending loans to LGR.  In fact, the guaranty states as follows: "this Guaranty is executed at Borrower's request [that is, at LGR's request] and not at the request of Lender."  (Am. Compl., Ex. C.)  Therefore, according to the express terms of the guaranty, Plaintiff did not even request the execution of a guaranty, let alone rely on it in loaning money to LGR.  While Rogers has failed to submit any opposition to the summary judgment motion, the Court finds that there is at this time a genuine issue of material fact as to Plaintiff's claim for breach of personal guaranty.  Summary judgment as to this claim, therefore, will be denied.

**C. Federal RICO Violations (Count I)**

The federal RICO statute, codified at 18 U.S.C. § 1961-68, provides, in relevant part, that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  To prove a violation of the federal RICO statute, a plaintiff must demonstrate: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

With respect to the enterprise element, it appears that the enterprise here is an association-in-fact enterprise.  An association-in-fact enterprise "must have a structure."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 366 (3d Cir. 2010)(quoting Boyle v. United States, 556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)).  "Specifically, it 'must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'"  Id. (quoting Boyle, 556 U.S. at 946, 129 S. Ct. 2237).

The Court finds that the evidence of record demonstrates that Rogers and the LGR Entities formed an association-in-fact enterprise.  It is undisputed that LGR Group, LGR Consortium,

and University Copy Services "are companies owned and/or controlled by and for the benefit of defendant Rogers." (Am. Compl. [Doc. No. 34] ¶ 14; Answer [Doc. No. 63] ¶ 14.) Defendants also admit that Rogers caused LGR Consortium and University Copy Services to open bank accounts at Roma Bank, and caused LGR Group to open an account at Susquehanna Bank. (Am. Compl. ¶ 26; Answer ¶ 26.) Silvana Milelli, the senior vice-president of Plaintiff, testified that LGR had an account with Plaintiff, and that checks were drawn on accounts of LGR Group, LGR Consortium, and University Copy Service and were made payable to LGR and were deposited at LGR's account at Liberty Bell Bank. (T. of 2/20/14 Hearing at 28:5-7, 30:24-31:10.) Rogers also confirmed that checks were written by LGR or entities that were related to or owned by LGR. (T. of 1/30/14 Hearing at 87:16-25).

In addition to the inter-relatedness of the entities, the evidence of record demonstrates that these four entities were associated for the purpose of conducting a check kiting scheme to hide the fraud that Rogers and LGR perpetrated on Plaintiff. The fraudulent nature of a check kiting scheme has been described as follows:

> By depositing in one account checks drawn on other insufficiently funded accounts, the offender in a check-kiting scheme tricks two or more banks into inflating account balances and honoring bad checks. In effect, the offender writes himself a series of

17

> unauthorized, unsecured, and interest-free "loans,"
> which may or may not be repaid.  His actions put the
> banks at risk for the amount of the insufficient
> funds and deprive the banks of their assets by
> placing the unauthorized funds at the disposal of
> the check kiter.

United States v. Jiminez, 513 F.3d 62, 73 (3d Cir. 2008)(quoting

United States v. Flowers, 55 F.3d 218, 219 n.1 (6th Cir.), cert.

denied, 516 U.S. 901, 116 S. Ct. 261, 133 L. Ed. 2d 185 (1995)).

     In this case, as noted above, Rogers caused LGR and the

other defendants to establish checking accounts with Plaintiff,

Susquehanna Bank, and Roma Bank.  LGR enjoyed "next day"

availability at all three banks, such that when LGR deposited a

check into its accounts, the banks as a courtesy made those

funds immediately available, even though the funds had not yet

been paid by the bank upon whose account the check was drawn.

LGR utilized this privilege to draw on funds in its accounts and

the accounts of its related entities before the funds were

actually paid among the banks, spending and replacing funds with

ultimately uncollectible checks, in a circular fashion.

     When Roma Bank directed Rogers not to deposit any more

money in the Roma Bank accounts, the checks drawn on those

accounts were dishonored, but Plaintiff had already credited the

funds to LGR's account.  When Plaintiff began to apply a series

of chargebacks to the account, corresponding to deposits that

LGR made at Plaintiff's bank for checks that were not honored by

other banks, the account had been overdrawn by $3,414,538.62. Additionally, the accounts at Susquehanna Bank had been overdrawn by nearly $3 million, and the accounts at Roma by $2.1 million.  The Court finds that the purpose of this association in fact enterprise was to allow Rogers to carry out a check kiting scheme to create artificially inflated account balances and defraud the banks, and the association existed for at least several months, if not years, during which time Defendants were able to defraud Plaintiff, Susquehanna Bank and Roma Bank of approximately $8 million.  The scheme to defraud only fell apart when Roma Bank refused to allow any further deposits into its accounts.

Turning to the "conduct" element of § 1962(c), Plaintiff must demonstrate that Defendants "participated in the operation or management of the enterprise itself," and that they played "some part in directing the enterprise's affairs." Reves v. Ernst & Young, 507 U.S. 170, 179, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993).  Here, Plaintiff lumps all of the defendants together and fails to present evidence that each individual defendant conducted or participated in the conduct of the affairs of the enterprise.  The evidence of record demonstrates only that Rogers and LGR participated in the conduct of the

enterprise;[2] there is no evidence that LGR Group, LGR Consortium, or University Copy Services played any part in directing the enterprise's affairs.

The Court finds that the remaining RICO elements are also satisfied.  To establish a "pattern of racketeering activity," a plaintiff must show that the defendants committed at least two predicate acts of racketeering from the list of acts provided in 18 U.S.C. § 1961(1).  18 U.S.C. § 1961(5).  Bank fraud, 18 U.S.C. § 1344, is one of the acts enumerated in Section 1961(1), and the Third Circuit has held that a check kiting scheme constitutes bank fraud.[3]  <u>United States v. Rafsky</u>, 803 F.2d 105,

---

[2] Rogers may be held individually liable under RICO as one of the "persons" who engaged in racketeering activity through the enterprise.  <u>See</u> <u>Jaguar Cars Inc. v. Royal Oaks Motor Car Co.</u>, 46 F.3d 258, 261 (3d Cir. 1995) ("corporate officers/employees . . . may properly be held liable as persons managing the affairs of their corporation as an enterprise through a pattern of racketeering activity.").  Rogers is the founder, sole managing member, President and chief executive officer of LGR, and LGR, LGR Group, LGR Consortium and University Copy Services are all controlled and beneficially owned by Rogers.  While LGR was the corporate entity through which Rogers defrauded Plaintiff, the Court also finds him individually liable given his intimate role in the operation of LGR.

[3] 18 U.S.C. § 1344 provides as follows:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial

107 n.1 (3d Cir. 1986).  Because the Court finds that Rogers and
LGR engaged in a check kiting scheme, the "racketeering
activity" element is satisfied.  Moreover, the Court finds that
in depositing multiple checks in an effort to defraud Plaintiff,
Rogers and LGR engaged in separate violations of the bank fraud
statute so as to satisfy the "pattern" of racketeering activity
element.  See United States v. Schwartz, 899 F.2d 243, 248 (3d
Cir. 1990), cert. denied, 498 U.S. 901, 111 S. Ct. 259, 112 L.
Ed. 2d 217 (1990).[4]

Finally, the Court notes that to establish a RICO
"pattern," it must also be shown that the predicate acts

---

institution, by means of false or fraudulent
pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned
not more than 30 years, or both.

[4] Courts in other circuits have held that if all predicate acts
derive from the same criminal scheme, episode, or objective,
there can be no pattern, continuity, or differentiation.  See,
e.g., Madden v. Gluck, 815 F.2d 1163, 1164 (8th Cir. 1987).
However, courts in this circuit have held that separate
fraudulent acts within the same scheme are sufficient to satisfy
the pattern element of a RICO claim.  See, e.g., Continental Cas.
Co. v. Slonchka, No. Civ. A. 04-1587, 2005 WL 2176834, at *7
(W.D. Pa. Aug. 18, 2005)("RICO's pattern requirement may be met
by a showing of 'multiple predicates within a single scheme that
were related and that amounted to, or threatened the likelihood
of, continued criminal activity.'") (internal citation omitted);
Sheridan v. Weinberger, 687 F. Supp. 152, 155 (M.D. Pa.
1987)("Most recently, however, the Third Circuit has ruled that
a complaint alleging two or more predicate acts in furtherance
of single, not necessarily on-going and open-ended, unlawful
scheme may be sufficient to establish a pattern of racketeering
activity.").

themselves amount to, or that they otherwise constitute a threat

of, continuing racketeering activity.  H.J. Inc. v. Northwestern

Bell Telephone Co., 492 U.S. 229, 240, 109 S. Ct. 2893, 106 L.

Ed. 2d 195 (1989).  The Third Circuit has interpreted the

Supreme Court's holding as follows:

> Of course, not every single scheme comprising two or
> more predicate acts will constitute a pattern.
> Continuity refers "either to a closed period of
> repeated conduct, or to past conduct that by its
> nature projects into the future with a threat of
> repetition."  A short-term scheme threatening no
> future criminal activity will not suffice.  Although
> Congress intended a "natural and common-sense approach
> to RICO's pattern element" and continuity "depends on
> the specific facts of each case," the Court delineated
> some parameters of the analysis.  The Court stressed
> that continuity is "centrally a temporal concept."
> Thus, the length of time over which the criminal
> activity occurs or threatens to occur is an important
> factor.  As the Court noted, "[p]redicate acts
> extending over a few weeks or months and threatening
> no future criminal conduct do not satisfy this
> requirement: Congress was concerned in RICO with long-
> term criminal conduct."

Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1412–13

(1991)(internal citations omitted).

The Court finds that although there is no longer an ongoing

fraud, this is not a case of an episodic fraud or racketeering

activity.  Plaintiff demonstrates a fraud which begot other

fraud in related contexts spanning at least from 2010 through

2013.  The initial loans may or may not have been procured by

22

fraudulent representations.[5]  However, at some point LGR was not

receiving income to repay the loans from Plaintiff because it

never purchased, and therefore never leased, the equipment that

was supposed to be purchased with the loan proceeds.  Rather

than return the loan proceeds, and to avoid defaulting on the

loans, Rogers and LGR engaged in the check kiting scheme,

purporting to make payments on the loans with money that was not

in their account.  In so doing, Rogers and LGR not only

defrauded Plaintiff, but also defrauded Susquehanna Bank and

Roma Bank.  While the conduct may have ceased, it lasted

sufficiently long to constitute a "closed-end" pattern of

continuous racketeering.

---

[5] Plaintiff contends that the initial loans were fraudulently
induced in two respects: for some loans, Rogers borrowed money
on the basis that the loan proceeds would be utilized to
purchase equipment, but he never purchased the equipment, never
returned the loan proceeds, and instead diverted the funds for
other purposes.  However, there is no evidence that Rogers -- at
the time he borrowed the funds -- had no intention of purchasing
the equipment.  For other loans, Plaintiff contends that Rogers
pledged leases as collateral for loans to two different banks,
but the extent to which the leases were already pledged to
Susquehanna Bank at the time Rogers also pledged them to
Plaintiff is unclear.  If the leases were not doubly-pledged at
the time he offered them to Plaintiff, he did not make
misrepresentations to Plaintiff.  In the absence of evidence of
material misrepresentations by Rogers, Plaintiff would not be
entitled to summary judgment under a common law fraud theory.
Bank fraud under 18 U.S.C. § 1344, by contrast, does not require
material misrepresentations, and LGR and Rogers' efforts to
defraud Plaintiff are sufficient to constitute bank fraud under
federal law.

Accordingly, the Court concludes that Plaintiff has presented evidence that Rogers and LGR violated the federal RICO statute based on their check kiting scheme, which has resulted in damages to Plaintiff in the form of overdrafts amounting to $2,089,911.04.[6]  Plaintiff also seeks to recover under RICO for the outstanding balance on the sixty-four loans between Plaintiff and LGR, which totals $2,222,299.64, on the basis that the only way Defendants could keep the loan payments current and, as characterized by Plaintiff, "delay the day of reckoning" was through the check kiting scheme.

The Court agrees that in addition to the check kiting scheme, Rogers and LGR engaged in bank fraud by failing to purchase equipment with loan proceeds as promised as a condition of the loans.  In United States v. Schwartz, 899 F.2d at 246, the Third Circuit noted that under the bank fraud statute, "it is an offense to execute a scheme or artifice to defraud a federally chartered or insured financial institution or to obtain money from it 'by means of false or fraudulent pretenses, representations, or promises.'"  Given the disjunctive statutory

---

[6] In addition, under RICO, Plaintiff is entitled to treble damages, costs of suit and attorney's fees.  18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.").

language, the Court held that "a person may commit a bank fraud without making false or fraudulent pretenses, representations or promises, as this is the 'plain meaning' of the statute."  Id.

Here, there is evidence that Rogers, through LGR, executed a scheme to defraud Plaintiff.  Rogers knew that he had borrowed money from Plaintiff to purchase equipment which he never purchased, instead retaining the proceeds and failing to obtain collateral to support the loans.  For example, although Plaintiff loaned LGR $588,114.67 for the purchase of 143 Savin Model 9033b copiers from FaxPlus, LGR never purchased the copiers.  In fact, Rogers falsely represented to FaxPlus that the reason for its inability to fund the sale was that Plaintiff would not release funds, even though Plaintiff had already provided the funds to LGR.  It simply cannot be denied that Rogers and LGR retained the loan proceeds with knowledge that these funds were not theirs to keep.

Similarly, while it is not clear whether LGR had already pledged certain leases to Susquehanna Bank at the time it pledged certain leases as collateral to Plaintiff, it is clear that at some point the leases were doubly-pledged as collateral to both banks.  At that point, LGR had obtained loans that were twice the value of the equipment he purchased and exceeded $1 million.  Again, Rogers must have known that LGR retained substantial excess funds that it was not entitled to keep, yet

failed to take steps to return the loan proceeds.  LGR and Rogers' conduct was fraudulent and violated 18 U.S.C. § 1344(a)(1).

However, the Court will not award Plaintiff the entire $2,222,299.64 requested through this summary judgment motion, as there is not evidence in the record that all sixty-four loans were procured or tainted by fraud.  As such, the Court will require Plaintiff to submit a separate application that delineates which of the sixty-four loans either were not secured by collateral despite a contractual obligation to obtain such collateral, or were secured by doubly-pledged collateral.[7]

**D.  Rogers is Not Personally Liable for LGR's Loans**

Plaintiff seeks to impose liability upon Rogers personally for the wrongdoing committed against Liberty Bell under the "participation theory" of liability.  However, liability under this theory requires that underlying action sounds in tort as opposed to contract.  <u>Saltiel v. GSI Consultants, Inc.</u>, 170 N.J. 297, 308-09, 788 A.2d 268 (N.J. 2002).  A tort remedy does not arise from a contractual relationship unless the breaching party

---

[7] Having found that Plaintiff is entitled to damages under RICO, which recovery is trebled, as well as damages for breach of contract based upon the sixty-four loans that are in default, the Court need not address Plaintiff's summary judgment motion to the extent Plaintiff seeks judgment on the remaining causes of action in the complaint, as any recovery thereon would be duplicative.

owed an independent duty imposed by law.  Id. at 314, 788 A.2d
268 (citing Int'l Minerals & Mining Corp. v. Citicorp N. Am.,
Inc., 736 F. Supp. 587, 597 (D.N.J. 1990)).

Here, with respect to the RICO claim, the Court already
found that Rogers is personally liable.  As to the breach of
contract claim, the loan documents defined the scope of the
parties' obligations and Plaintiff does not present any evidence
that Rogers owed it an independent duty that arose other than by
contract.  As such, the "participation theory" is inapplicable
to Plaintiff's breach of contract claim.

### E.  Plaintiff's Request for Permanent Appointment of Receiver and Accounting

Finally, Plaintiff requests in light of Defendants'
conduct, that the Court enter an order making the Receiver
permanent and requiring a final accounting in due course.
Subsequent to the filing of Plaintiff's summary judgment motion,
the Receiver filed a motion to set a claim bar date and prepare
a report and recommendation concerning the disposition of the
assets of the LGR Entities.  In support of the Receiver's
motion, the Receiver represents that the LGR Entities are not
viable as going concerns, and that it is in the best interest of
the creditors of the LGR Entities that the Entities' affairs are
wound down.  The Court, by separate Order, will grant the
Receiver's motion and finds that appointment of a permanent

receiver is unnecessary at this time given that the business of the LGR entities will be wound down.  The Court will direct that an accounting be performed in due course in connection with the report and recommendation to be prepared by the Receiver.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant summary judgment in favor of Plaintiff on Count I of the amended complaint to the extent Plaintiff asserts a RICO claim against Rogers and LGR, and summary judgment will be denied to the extent Count I asserts a RICO claim against the other LGR Entities.  Plaintiff will also be granted summary judgment on Count IV of the amended complaint for breach of contract as to LGR.  Plaintiff's motion for summary judgment will be denied as to Count V of the amended complaint for breach of guaranty as to Rogers.  Plaintiff's motion for summary judgment as to Counts II, III, and VI[8] will be denied without prejudice, as the Court has not addressed these counts given its findings with respect to the RICO and breach of contract claims.

_____

[8] Count VII is a claim concerning fraudulent transfers of equipment and funds from LGR to the remaining LGR Entities. Plaintiff has not specifically addressed this count in its summary judgment motion, and the Court does not address it herein.

Plaintiff will be granted leave to file a renewed application with respect to the amount of damages to be awarded in connection with its RICO claim.

An Order consistent with this Opinion will be entered.


```
                                  __s/ Noel L. Hillman_____
                                  NOEL L. HILLMAN, U.S.D.J.
Dated: September 22, 2015

At Camden, New Jersey
```